## TED ELLIOTT v. STATE.

No. A-5988. Opinion Filed June 29, 1929.
Rehearing Denied October 19, 1929.
(281 Pac. 305.)

Bridges, Vertrees & Ivy and H. W. Sitton, for plaintiff in error.

George F. Short, Atty. Gen., and Leverett Edwards, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, for convenience referred to as the defendant, was convicted in the district court of Jefferson county, on a change of venue from Stephens county, of the crime of rape in the first degree, and his punishment assessed at imprisonment in the penitentiary for a term of 15 years.   Upon this appeal

from the judgment rendered in pursuance of the verdict, various errors are assigned, among which is the overruling of the appellant's motion to have the case set for trial September, 1925, term of court. This question was considered by this court in the case of Sledge v. State, 40 Okla. Cr. 421, 269 Pac. 385, and Brown v. State, 42 Okla. Cr. 11, 273 Pac. 1018, companion cases, and decided adversely to the defendant's contention. Following the cases of Sledge v. State and Brown v. State, supra, we hold that the contention is without merit. It is not contended by the state that Ted Elliott actually committed rape on the prosecuting witness, Ethel Sreywas, but that he aided, abetted, encouraged, and knowingly permitted Harry Sledge to commit rape upon the said prosecuting witness.

The defendant filed a demurrer to the information for the reason that the same fails to state facts sufficient to state a cause of action against the defendant, Ted Elliott. Upon examining the information, we hold the information stated sufficient facts to advise the defendant of the charge against him and the court did not err in overruling his demurrer to the same. The defendant also filed a motion to quash the information on the ground that the defendant was not arraigned as provided by law in the county where the alleged crime was committed and where the case was triable, which motion to quash was considered by the court and overruled, and defendant excepted. We find that the motion to quash was without merit and was properly overruled by the court.

This is a companion case to the cases of Sledge v. State, and Brown v. State, supra, in which cases the record was more fully set out than we deem necessary to set out in this opinion. The following is a brief statement of the facts which we gather from the evidence, which will an-

swer our purpose in considering the remaining assignments.

The record discloses that on the evening of February 22, 1925, the prosecutrix and her sister Lillian, 20 years old, were walking along the street in Duncan, when the defendant herein, in company with Harry Sledge and Bill Brown, drew up to the curb in a Ford coupe and invited the girls to ride with them; the girls were acquainted with Ted Elliott, and he introduced the prosecutrix and her sister to the other two defendants, and asked them to take a ride, the girls declined the invitation saying they had some shopping to do, and the defendant, Ted Elliott, then inquired if they could come to the house of the prosecutrix, and the witness Ethel Sreywas told them they would be at home in about 30 minutes. Elliott, Sledge, and Brown shortly thereafter drove up to the porch where the prosecutrix and her sister lived, and this defendant went up to the porch and asked the girls to go to Harry Sledge's home and they would play the victrola and dance; they were going by and get another girl named Billy Morrison. Harry Sledge said he had a girl, he would get her, and they consented to go and the prosecutrix got in the car with them. They drove to Billy Morrison's and she got in the car with them. They then drove to where Sledge wanted to see a girl by the name of Fern. When they got to her house the young lady could not go. They then drove around town, and the testimony tends to show that Billy Morrison and the prosecutrix appealed to the boys to take them back to their homes, but instead they drove out in the country to what is known as the Sledge home. They parked the car in front of the house, and Harry Sledge went in and lit the lights. Then the defendant went in the house where Sledge was and came back and asked Bill Brown to get out and bring the girls in, and that Billy Mor-

rison got out and went in with Ted Elliott, the defendant. A few minutes later, while standing in the middle of the room, she heard Billy Morrison hollow. Ted Elliott left the room, and she asked Bill Brown to take her home and started out of the room, when Sledge came in, walked around them, and said, "Bill, let me have your girl." Some one closed the door, and she asked Harry Sledge to take her home. Then she heard the car drive off, and Harry Sledge turned the light out and told her everybody was gone. He then threw her down on the cot and commenced to choke her. She kicked him and bit the side of his face. He said: "I will kill you or do what I started to do." That she screamed every time he let loose of her throat, and did everything she could to get loose from him until she became helpless, and by overcoming her utmost resistance he accomplished an act of sexual intercourse. He then got up and turned on the light. That her head and face were covered with blood. He said, "Get up from there and wash that blood off, or you won't go home until morning." That she went into the kitchen and washed her face. Then Ted Elliott came into the kitchen and he washed her face. They went back to the middle room, and Billy Morrison and Bill Brown came in. That after some talk Harry Sledge said, "You better take the girls and go home before there is any further trouble." And Bill Brown, Ted Elliott, and Billy Morrison took her home. She told her sister Lillian what had occurred, and she telephoned Dr. McGregor, and shortly afterwards he called and examined her and treated her, and she was under his care and that of two other physicians for the next three weeks.

Billy Morrison testified, in substance: That she lived in Duncan. She knew the defendant, Ted Elliott, and also knew Harry Sledge. On the night of the alleged offense, she saw Ted Elliott and Harry Sledge. They came

to the house where she was living; in the crowd was the defendant, Bill Brown, Harry Sledge, and Ethel Sreywas. Ted Elliott introduced Bill Brown as Bill Smith.

"I was staying at Mrs. Ford's at the time. When we left where I was staying, we went to Fern Hossington's place. Sledge got out and went into the house. He came back and asked us to come in the house and dance. We did not go in. I told them I had to go back home, and Sledge said he would take me home. They drove down the street and stopped, and we asked them why they stopped, and Elliott said they were going to get some whisky. They did not get any whisky. When we started again we told them to take us home, and we drove to the taxi corner and stopped the car, and Sledge got out and took the key and went up the street. When Sledge returned, he said he was going to take me home, and kept on going north on Eighth street. I said, 'This isn't the way to take me home,' and he said he was going out to the farm, there was a man he wanted to see, and as soon as he saw him he would bring me home. When we got to the farm, Ted Elliott and Harry Sledge went into the house. They were gone a short while, and Ted Elliott came out on the porch and asked us to come in. We got out of the car. Ted Elliott came out to the car before Ethel got out. I heard him say to Ethel, 'Are you going to sit in the car all night?' In the middle room of the house there were three cots, a gas stove, and a gas light. I left the middle room and went into the front room. Harry Sledge came in behind me and closed the door. Ted Elliott came in the room immediately, and I took hold of Ted and held on to him, and he told me to turn him loose, and Harry Sledge began choking me. About that time a car drove up and Sledge went out to the car, and I asked Ted Elliott again to take us home, and he said he would take Ethel and me home. About that time Bill Brown came in the room and I asked him why he did not come in and help me, and asked him where he had been; Harry Sledge came back in the room, and Ted Elliott, Bill Brown, and I went into the front room and Sledge went on in the middle room. They

stayed there a short while, and Ted Elliott came back into the front room and told me he was going after some cigarettes. When he got to the front porch, Ethel started toward the car, and I started toward the car. I asked Elliott if I could go with him and stepped on the running board, and he pushed me away and drove away from there. After Elliott left, Bill Brown and I sat on the porch. Immediately after that I heard Ethel scream very loud, and I told Bill Brown to go in and help Ethel. He refused to go and stop any car that passed and held me and would not let me go in the house, and would not let me go to the rig. There was an oil well being drilled near the house. Ethel kept screaming for about 20 minutes. Shortly after the screaming ceased, Elliott returned to the house. When he came, I told him to go to Ethel, and he said, 'What is wrong?' And I told Ted to go to Ethel as quick as he could, and he said, 'What is wrong?' And I told him to go to Ethel, and when he went in the house he came out and told me he wanted to see me a minute, and I went in the room, and he told me Harry did what he started in to do, and they both were in a bad condition, and he wanted me to come in and talk to Ethel. Ethel's face was covered with blood and one of her eyes was swollen and blood all over. Ted Elliott and I sat down on the cot in the northeast corner of the room, and Ted said all of us have gotten into it and had better get out the best way we could, and the best thing was to turn this into a car wreck, and Ethel and Harry got thrown through the windshield and Ethel got cut under the eye. While this conversation was going on, a car drove up, and Harry Sledge left the room. He was gone about five minutes and came back. Ethel heard her name called, and asked him why he did not tell she was out there, and asked who it was, and he said it was her sister. Ethel said, 'You brute, why didn't you tell her,' and he said, 'Don't call me a brute or I will knock your other damned eye out.' We sat there 30 or 40 minutes after that, and Ted told Ethel it had all happened and could not be helped now, and if she told it it would only be a scandal on her and Harry would get out of it, that his dad was behind the law and he could get out of it,

and that it would only be a scandal on her. Ted Elliott, Ethel, and Bill Brown all came to town with me. We did not go direct to Miss Sreywas' home. Ted was begging Ethel not to tell it, to keep it quiet. I saw the boys next morning, and we said we were not going back to the Sreywas home. We drove by that night, and the house was lighted, and there were several cars there, and we knew there was trouble, and we were not going back there."

On cross-examination witness testified: She had never met Bill Brown personally—

"We stopped the car in front of the porch; I would not say how far it was from the porch. I could not say whether anybody lived in the house or not. The reason I went to the house, Ted came and asked us to come in and wait. It was misting rain and chilly. Ted came back a short time after the screaming ceased. Bill Brown held me and kept me from going to the cars until after the screaming ceased. I knew something was going on wrong with Ethel. I tried several times to get in there to help her. I did not go around to the window while this was going on and see Ethel and Harry sitting on the cot. Bill Brown went around to the window. Bill said there was nothing wrong; they were sitting there arguing. It was Ted Elliott that suggested it would be a good idea to turn it into a car wreck, and the boys joined in. I did not agree to that. Ted had shoved me off the running board of the car when he started to town and I wanted him to take Ethel and me home. He did not tell me he was going to get another girl. I became suspicious after Harry Sledge was choking me. We drove to town and drove around a little while that night before we went home. There was Bill Brown, Ted Elliott, Ethel, and myself in the car. It was discussed between us as to it being reported as a car wreck. Ethel said she was going home to tell her sister. Ethel just asked us to come back early the next morning. Elliott was the one that wanted to turn it into a car wreck, and I told Ethel that night I would work in her place next morning if she wanted me to. We were not calling it a wreck at that time."

On redirect examination, the witness stated that at the Sledge house Ethel said she had to work, and Harry said if it was money she was harping about he would give her plenty of money.

"Harry was choking me, and I took hold of Ted Elliott and he began telling me to turn him loose. He did not do anything to Harry. It is not true Ted stopped Harry Sledge from assaulting me. The rig was about 300 feet from the house, I guess. The window that Bill Brown went around to was on the south side."

Testimony was introduced by the county attorney showing he went to the house where the offense was alleged to have taken place and about having seen blood spots on different places in the room. The doctor was called and testified as to the examination made on the prosecutrix, Ethel Sreywas; that she was beaten about the face, cut under her left eye and upper lip, and her left eye was bruised, and several marks such as would be made by finger nails on her neck—

"I found the inner part of her thigh covered with blood and bruised, and I should say a recently ruptured hymen; I would say the rupture was produced by a recent act of sexual intercourse; I treated her two or three weeks."

This testimony was corroborated by other doctors who were present at the examination. At the close of the doctor's testimony the defendant moved to strike from the record all the testimony of the witness Dr. Barkley for the reason that it was incompetent, irrelevant, and immaterial, and the state having heretofore shown that whatever her condition was, was brought about by another and there has been no application shown or attempted to be shown between this defendant and the party guilty of her condition, and there has been no proof introduced on

the part of the state that would permit this testimony to go in against the defendant, and it is highly prejudicial to his interest, and we now ask the court to strike from the record, and admonish the jury not to consider it, which motion was overruled, and defendant duly excepted. The state then announced that with the exception of the introduction of the record as to what Ted Elliott said as to where he was and what took place when he went back to the Sledge farm house to get the defendant Sledge, and where he took Sledge for the remainder of the night, the state would close.

The defendant then stated to the court that the defendant, Ted Elliott, was present in court and they offer him to the state for its witness for any purpose they choose. The record was then properly proven as to the testimony given by Elliott as to his actions, and he showed he was in the crowd and took the prosecuting witness home, and afterwards returned to the Sledge farm and got Harry Sledge and took him to his home, and that Sledge remained with the defendant all that night. The defendant offered no testimony. When the state closed its testimony, the defendant demurred to the evidence introduced by the state for the reason that said testimony introduced is wholly insufficient to connect this defendant with the commission of the crime charged, which demurrer was overruled and defendant excepted. The defendant urges that it was the duty of the court under the law, and under the testimony in this case, to sustain the defendant's demurrer to the testimony offered on behalf of the state, for the reason that there is no testimony in the case connecting the defendant with the commission of the crime, or that connects him with Harry Sledge in the commission of the crime, or in any manner connects him with aiding and abetting in the commission thereof. The record in

this case discloses that the defendant in this case, together with Harry Sledge and Bill Brown, went driving on the streets of Duncan where the prosecutrix and her sister were spoken to, and the car in which the defendant and other parties were driving stopped at the curb; that the prosecutrix knew Ted Elliott, but was not acquainted with Bill Brown or Harry Sledge; that when the Sreywas girls were introduced to Brown and Sledge, Brown was introduced as Bill Smith by the defendant.

The testimony further shows this defendant was actively engaged in trying to get the girls to go for a drive, and this defendant, aided by the other defendants in the car, drove from place to place to get a girl for each of the boys, but they failed, and only the prosecutrix and Billy Morrison were in the car; they promised to take them home, but instead of doing so they drove to the Sledge home a short distance away. The proof further shows that when they got out to the house Harry Sledge and this defendant went in the house, and then the defendant came out and asked the others to get out and come in the house; that finally the prosecutrix got out and followed Billy Morrison into the house; that after they got in the house Sledge took liberties with Billy Morrison, and she appealed to the defendant to make Sledge refrain from his actions and the defendant failed to do so; that Billy Morrison came out into the next room and left Sledge in the house with the prosecutrix; defendant then stated he was going to town to get some cigarettes, and Billy Morrison begged him to take them back to town, and got on the running board of the car and was shoved off by the defendant, who drove away leaving Harry Sledge and Ethel Sreywas in the house and Bill Brown and Billy Morrison outside; within a short while the defendant, Ted Elliott, returned to the house and wanted to know what

had happened, and then it was that Sledge told him what had taken place while he was making the trip to town; while in the house the proof shows this defendant suggested that the incident should be reported as a car wreck in order to not injure the reputation of the outraged witness, Ethel Sreywas; the girls insisted that from the time they started from town they appealed to the boys to take them home, and they would not do so; they were all young people, and it is clear from the record in this case that Harry Sledge and this defendant intended to get the girls out to this house, and that Sledge intended to carry out what he carried out when they drove out to the house where the offense is alleged to have taken place.

It is urged by the defendant that he was not present when the rape was committed, but that he returned to town to get another girl and some cigarettes. This argument is presented without any testimony to support it, except that it is admitted that after the defendant assisted Harry Sledge and Bill Brown to get the two girls to the house where the offense is alleged to have taken place, and after he had gotten out of the car and gone in the house with Harry Sledge, he came out and succeeded in persuading the girls to get out of the car and go into the house. The testimony shows that Sledge took liberties with Billy Morrison, and she appealed to the defendant, and he refused to give her any assistance; that Sledge took Ethel Sreywas into the adjoining room, and the defendant Bill Brown, and Billy Morrison went out on the porch, and when this defendant started to leave the place in the car Billy Morrison appealed to him to let them go to town with him, getting on the running board of the car, and was shoved off by defendant. The defendant drove away.

In considering the guilt or innocence of the defendant, it is necessary to consider his actions from the time the

Sreywas girls met the defendant, Bill Brown, and Harry Sledge, up to the time of the alleged offense, and after the offense was committed up to the time he went back to the house and got Harry Sledge and took him home with him, where Sledge stayed the remainder of the night. The question is: Is the testimony in this case sufficient to. show that the defendant, by his actions or words, conspired with Bill Brown and Harry Sledge, or either of them, to get these girls out to the house in order to give Harry Sledge an opportunity to commit the outrageous and unspeakable crime he did upon the young and defenseless girl, Ethel Sreywas. The defendant insists that the facts and circumstances are consistent with his innocence, and that the court should have instructed the jury to return a verdict in favor of the accused, and that the verdict is not supported by sufficient evidence.

The evidence and all the facts in this case tend to show that the defendant was aiding, abetting, and assisting Harry Sledge to get the girls out to his house in order to give Harry Sledge an opportunity to commit the crime he committed. It is not contended by the state this defendant was actually present when Harry Sledge outraged Ethel Sreywas, nor was it necessary that he be present if the evidence and facts and circumstances tend to show the defendant entered into the conspiracy and aided, abetted, and assisted in getting these girls out to the farm house where he could have an opportunity to commit rape upon the prosecutrix. All the evidence in the case and the circumstances therewith strongly indicate that the defendant knew what was going to take place when he assisted in getting the girls away from town and out to the Sledge farm house without their consent, and after they had begged him to take them home.

The testimony further tends to show that the defendant desired to conceal what had happened by reporting the cause of the bruises being a car wreck. We think the testimony sufficient, if believed by the jury, to show that the defendant by his acts in introducing the girls to Bill Smith, instead of giving the correct name of Bill Brown, and insisting on the girls going out to the farm and refusing to take them home when they appealed to him, and refusing to interfere in any way with Harry Sledge taking liberties with the girls, is sufficient to show that the defendant had conspired with, and aided, abetted, and assisted Harry Sledge in committing the crime of rape heretofore referred to.

In Blanck v. State, 14 Okla. Cr. 339, 169 Pac. 1130, 1132, the court said:

"This court has repeatedly held that the least degree of concert of action or collusion makes the act of one conspirator the act of all, and each conspirator is liable for the act of each other conspirator done in pursuance of such conspiracy." Holmes v. State, 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300; Ex parte Hayes, 6 Okla. Cr. 321, 118 P. 609; Wishard v. State, 5 Okla. Cr. 611, 115 Pac. 796.

We hold that the evidence was sufficient to warrant the court in overruling defendant's motion for a directed verdict of not guilty. This court has repeatedly held that where there is competent evidence, though conflicting, it was the province of the jury to pass upon the same under proper instructions of the court.

The defendant further urges that the court committed error of law in its instructions to the jury, and in refusing to give certain requested instructions to the jury. After a careful consideration of the instructions in their entirety, we find that the court stated the law applicable to the facts

in the record, and that the court did not err in refusing to give the instructions requested by the defendant. The instructions requested by the defendant are substantially covered by the instructions given by the court, and the refusal of the court to give the requested instructions did not prejudice the defendant.

It is next urged by the defendant that the county attorney in his closing argument made statements prejudicial to the rights of the defendant which deprived the defendant of a fair and impartial trial. A careful reading of the record discloses that the statements complained of were in reply to the argument of counsel in presenting the good character of the defendant.

We hold that the evidence is sufficient to sustain the verdict; the instructions were fair to the defendant and substantially stated the law.

The judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.