## GASTON GORDON v. STATE.

No. A-8629.    March 16, 1934.
(30 Pac. [2d] 934.)

H. C. Ivester, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter referred to as the defendant, was convicted of the crime of rape in the first degree and sentenced to serve a term of 15 years in the state penitentiary.   Motion for new trial was filed, considered, overruled, and defendant appeals.

Chester Davis, a witness on behalf of the state, testified in substance as follows:

"I live south and east of Erick; was in Erick on the 7th day of January, 1933; saw Gaston Gordon with Albert Yeary in front of the barber shop; I was talking with Walter White; I saw Eddie Lee Parker with Mildred Loggin go by; Mr. Yeary called Walter White over to where he and Gordon were, and asked him to make a date; the defendant was present at that time, I did not hear him say a word."

Eddie Lee Parker, testifying on behalf of the state, made the following statements:

"My name is Eddie Lee Parker; I live one-half mile north of Carl; in January, 1933, I lived six miles northwest of Erick; I was seventeen years old on that date; we arrived in Erick about 11 o'clock and went to Mamie's Beauty Shop, and remained there about fifteen minutes, then Mildred Loggin and I walked around town just window shopping; I saw Walter White and he asked me to go riding with him; I refused; I saw him a second time

at Ray's store, he asked me again to go riding with him and I refused; I saw him again about 2 o'clock near the Max Theater; Mildred Loggin was with me; Wayne Jones, Myrtle and Olive Hill were with Walter White; Olive Hill asked me to go with her down to a house to wait until a car came to take her to Texola; I asked which house, and she refused to tell me; Myrtle asked me to go and I told her I did not have time; Walter asked me several times and I finally consented, because Olive said she did not want to wait by herself and we would not be gone but about ten minutes. We went down with Walter White and Wayne Jones; when we got there I found we had gone to Gaston Gordon's home, the defendant in this case.

"This plat handed me is a correct plat of the house; we entered the house through the east bedroom; immediately after I entered the room I saw David Epps and Pauline Sandlin lying on the bed, the shades were pulled down; I started to leave and Walter grabbed and held me; I came back to the bed and all of them were sitting down; Albert Yeary came and knocked on the door and Walter White let him in; Albert threw some liquor on the bed and the boys began to drink; Myrtle and Pauline took a drink; Albert asked me to have a drink and I refused, and he said, 'Well, you are going to take a drink before you get out of the house;' I thought I would pretend to drink, and Walter says, 'You can't fool me, you are not drinking;' he came over and held it to my lips and I took one drink; immediately after that Albert began to try to make love to me; I resisted him and started toward the east room and he grabbed me and continued to make love to me, and threw me on the bed and was trying to pull up my dress; he was holding my hands and I was resisting him in every way I could, slapping him and pulling his hair and kicking him; I asked those present to help me get loose, but neither of them rendered any assistance; Olive Hill left; I was in the house with the rest of them for about 30 minutes when they all left but Albert Yeary; I was fighting him and he was pulling up my dress and trying to do anything he could; when I began screaming he called me

a baby sport, and struck me in the eye and knocked me backward on the bed; during that time Gaston Gordon knocked on the door and Albert opened the door and Gaston came in; Gaston Gordon is the defendant in this case; I had never seen him before and thought perhaps he had heard me screaming and asked him to help me, and he said in a way he would, and Albert pushed him out and locked the door; just about five minutes after Gordon entered the room Olive Hill and Tommie Ray Loggin knocked on the door; they shoved me into the bathroom and put my shoes in after me, Yeary had taken them off; Wayne Jones was in the bathroom, and asked me what I was crying for, and asked me where I got my black eye and I told him Albert gave it to me; he told me to go upstairs and he would not let them bother me; I tried the hall door and it was locked; Wayne Jones followed me and I asked him to let me out; I went into the east room and sat down on the bed and he tried to have intercourse with me and I resisted him; the window shades were up about twelve inches and I saw Myrtle and Olive Hill and Pauline Sandlin on the outside, and Wayne Jones unlocked the door and I went out; I asked them to wait until I got my hat and coat, and when I went in I saw Gaston Gordon in the west bedroom; Albert Yeary and Tommie Ray Loggin was with Gordon; they were trying to keep Tommie Ray Loggin from going out of the door.

"I could see Albert Yeary and Gordon fighting Tommie Ray in the west room, and Wayne was good enough to let me out once—I thought he would again; I got my coat and hat and Wayne would not let me out; then Walter White, Gaston Gordon, Albert Yeary, and David Epps came in the room; Albert Yeary threw me on the bed and began pulling up my dress; I slapped him and pulled his hair and was asking for help, and neither of them would help me in any way whatever; finally Gaston Gordon came and pulled Albert off and said, 'I want to see this girl;' he said if I would go with him he would let me out; I went with him through the bathroom and hall; he got my hat and coat for me, and while he was getting my hat

and coat I tried to get out at the north hall door; he said, 'Here is your hat and coat, here is the key, this is my house,' he said, 'All the other boys intended to jazz you, if you show me a good time I will let you out,' and I says, 'I won't do it, I will stay here all my life first,' and he threw my hat and coat on the floor and stepped on them; he then tried to pull me in to the west bedroom; there was no one present and Gordon had hold of me and finally pulled me away from the north room door; he then said, 'I do not have to get you to the bed, I will show you right here;' he shoved me up against the wall, held my hands over my head, and began stepping on me to make me open my legs and put his right foot inside mine; I did everything I could; he had me pressed against the wall; I struggled and fought for about 20 minutes, and he penetrated my body and hurt me; he finally said, 'I am through with you,' and walked in to the bathroom; Walter White came in as he went out and I went to this west bedroom door and tried to get out. Walter told me if I would go upstairs I could get out; I went up there, I thought there was an outside entrance; Walter told me there was; when I got up there Walter locked the door; I went to a window, the window had paper pasted over it, and I began jerking this off, and he threw me on the bed and held my hands and I began fighting him, but he kept on until he had intercourse with me; I knocked him and slapped him and did everything I could; I heard knocking at the door all the time; it was Albert Yeary; Walter opened the door for him and Albert came in after Walter had intercourse with me. Albert Yeary came in and jerked me away from the window and threw me on the bed; Walter was standing in the room and I asked him to help, but he would not assist me for the reason that Albert took out a pocket knife and threatened him; then Walter went out of the room; Albert threw me on the bed and by force, after hours of fighting, knocking and slapping—I did all I could—he accomplished his purpose and had intercourse with me. As soon as I got loose from Yeary I went down stairs and a truck drove up. Albert asked me if my folks came in a truck and I told him yes, and Albert said, 'That is her

mother, let her go'; as soon as I could get out of the house I went to my brother's home in town; my mother and sister-in-law were at home; this was about 6 o'clock in the evening, and I told them what had happened."

Walter White testified on behalf of the state and admitted they got together in town and went down to Gaston Gordon's place; the place where Gaston Gordon lived is known as the Bonefield apartments—

"After we got down to the house Albert Yeary came in and started fooling with Eddie Lee Parker; he brought a pint of liquor with him; Albert Yeary pushed Eddie Lee Parker on the bed and forced her to lie there; it looked like he was taking unfair advantage of her; Miss Parker did not allow him to make these advances but resisted by fighting and slapping him; she asked for help and Olive Hill helped her once; when Olive Hill pulled Eddie Lee Parker away from Albert they tried to get out of the house but Albert would not let them out; David Epps and Olive Hill left; Myrtle Hill and Pauline Sandlin were outside; they held Miss Loggin in the house; I mean Albert Yeary, David Epps, and myself; we then went back in the room we had first gone in and found Wayne Jones and Eddie Lee Parker; when we came in Albert began bothering Eddie Lee; they fought for about ten minutes I would say; they quit fighting when Gordon, the defendant, came in; he said we wanted to see her, he would help her out; they went into another room; I did not see Miss Parker after that; Gordon came back to the bathroom door, was there just a few minutes; after Gordon went out with Eddie Lee Parker I heard some one, sounded like a woman's voice, crying, and heard some words stop and quit; after that I went upstairs with Eddie Lee Parker, she wanted me to help her out; she went up stairs with the understanding that I would help her get out; I represented to her there was an outside entrance up stairs; when we got upstairs I put her on the bed; she fought me; I forced sexual intercourse with her; every thing I did was over her protest and resistance; as we started to leave Albert

Yeary came up and grabbed her and threw her back on the bed; she asked me to help her and I endeavored to help her but Yeary told me to leave on out of the room and I did; I heard some talking but could not understand whether it was crying or not; it sounded like a woman's voice crying; I came down stairs and they came down as a truck drove up, and Albert said something about the truck; I don't know what he said, anyway he let her out of the house. Miss Parker said Gaston had been fighting her; Albert Yeary and myself then started to town; Albert said he finally got the job done after so long, some words like that; Miss Parker told us she was going to report what had happened.

Myrtle Hill, called as a witness, testified in substance as follows:

"I live six miles south of Erick; was in Erick during the day of January 7, 1933; saw Eddie Lee Parker at the Max Theater with Mildred Loggin; my sister Olive was with me; I saw Walter White standing a little ways from the theater; my sister Olive had a conversation with Miss Parker; Olive asked her to go down to the Bonefield Apartments and dance, and she would not go at first but Olive said there was a car coming to take her to Texola and she finally went; Walter White, myself, Eddie Lee Parker, Wayne Jones, and Olive went to the home of Gaston Gordon; Dave Epps and Pauline Sandlin was on the bed when we got there; in about 30 minutes Albert Yeary came and brought some whisky; all drank from the bottle; Albert was familiar with all of us but mostly with Eddie Lee; he put his arms around her and threw her on the bed; after he put her on the bed he was fighting her and she was resisting him; she tried to get out but Yeary was standing at the door and would not let her; my sister Olive and David Epps left; about 30 minutes after Yeary came in I left the room and went up stairs with Pauline Sandlin, Walter White and Wayne Jones; while up stairs I heard screams coming from down stairs; when I heard the screams I tried to get out, Walter White and Wayne Jones would not let me; Dave Epps came back in about

ten minutes; I saw Wayne Jones again when he pulled Eddie Lee in the door as I came out of the front door of the east room; I saw Gaston Gordon holding her as I came down the stairs; after I got out of the house Eddie Lee Parker came out; we asked her to go to town with us; she showed us her black eye and said Albert Yeary struck her; said she had to go back and get her hat and coat; at that time I saw Tommie Ray Loggin in the south room fighting Gaston Gordon and Albert Yeary."

Tommie Ray Loggin testified to being at the Gaston Gordon home with other parties the afternoon of the alleged offense, and stated:

"I did not leave the house immediately because I could not get out, they had all the doors locked; I was fighting the defendant Gaston Gordon and Albert Yeary; in about 15 minutes I managed to get out; when I got outside I found Pauline Sandlin and Myrtle and Olive Hill; I did not remain any length of time after that."

Mrs. E. M. Parker tesified as to her daughter going to town with her after the alleged offense; the daughter going home and reporting what had happened. Other witnesses were called by the state who testified to the report received of the crime and arrest of the defendant.

Wayne Jones, who had been subpoenaed by the state but not used, was called as a witness for the defense, and detailed the meeting of the different parties, and their going to the home of the defendant, Gaston Gordon; he said the doors were closed and the night latch turned from the inside; I don't remember any one trying to get out for about 30 minutes; Walter White did not keep Eddie Lee Parker from going from the house that I remember.

"Q. Did you hear Eddie Lee Parker make a protest, well this is not the place I thought it was, this is not the place for me, I am going to leave. And started to leave

when she first got in? A. Not that I remember. Q. If she made any statement you did not hear her? A. Yes.. David Epps left a few minutes after Albert Yeary came in; Olive Hill left out through the front door, when myself and several others went up stairs we left Eddie Lee Parker and Albert Yeary down stairs; Pauline Sandlin suggested we go up stairs; I went in the south room when I got upstairs and stayed there possibly an hour; I don't remember how long it was after I went up there until I turned off the lights; David Epps came in while I was up stairs; I went up stairs with Myrtle Hill, and Pauline Sandlin with David; I never heard a sound of wailing, crying, or screams while I was up stairs; the first time I saw Gaston Gordon was when Eddie Lee Parker and I were down stairs in the front room; he was in the bathroom; she was not on the bed with Albert Yeary; Gaston Gordon was not on the bed with her; Gaston Gordon on that occasion did not assault her or lay his hands on her in any manner to ravish her; he went over and made Albert leave her alone and told her he would let her out; that is the last time I saw them; I had taken her hat and coat; I don't remember whether she or Gaston Gordon followed for her hat and coat; I did not see Gaston hold her in the bathroom."

The defendant called several doctors, who were asked hypothetical questions as to the probability of forced cohabitation with a young woman pressed against a wall in a standing position, and they answered it would be difficult, but there were certain conditions that would have to be understood before they could give definite answers. The defendant did not take the witness stand.

We have set out all the testimony that it is deemed necessary in order to arrive at a correct decision.

The defendant has assigned 13 errors alleged to have been committed by the trial court. The defendant in his brief has grouped his assignments of errors and argues

in one group assignments 1 and 2. These assignments relate to the misconduct of the county attorney and the assistant county attorney in their opening argument; the alleged misconduct is as follows:

"Mr. Cornels: I believe I said there was no denial that there was intercourse between the defendant and Miss Parker, or that there was intercourse between the defendant and Miss Parker willingly. Mr. Ivaster: By the defense. Mr. Cornels: Did I say by the defense? Mr. Ivaster: Certainly. Mr. Cornels: All right. Mr. Ivaster: The defendant objected to the remarks of the assistant county attorney."

Section 3068 of the Okla. Stats. 1931, is as follows:

"In the trial of all indictments, informations, complaints and other proceedings against persons charged with the commission of a crime, offense or misdemeanor before any court or committing magistrate in this state, the person charged shall at his own request, but not otherwise, be a competent witness, and his failure to make such request shall not create any presumption against him nor be mentioned on the trial; if commented upon by counsel, it shall be ground for a new trial."

Defendant's counsel in his argument urges that the remarks of the assistant county attorney, wherein he referred to the fact that there was no denial by the defense that there was intercourse between the defendant and Miss Parker or that there was intercourse between the defendant and Miss Parker willingly, is sufficient to warrant the court in reversing the judgment, and cites in support of his argument Nowlin v. State, 7 Okla. Cr. 27, 115 Pac. 625, 121 Pac. 791; and Weinberger v. State, 8 Okla. Cr. 441, 128 Pac. 160.

Upon examination of the cases cited by the defendant we find the county attorney in his argument to the

jury, in 7 Okla. Cr. 27, 115 Pac. 625, 121 Pac. 791, 792, supra, said:

"If appellant had not left the barn as testified to by the state's witness, he (appellant) would have been the best witness as to that fact."

This statement clearly shows that the county attorney made a direct reference to the defendant Nowlin not having testified in his own behalf, or not having controverted the state's witness. The statute quoted, supra, is mandatory and must not be violated directly or indirectly, either in the letter or spirit. The statement of the county attorney complained of in the case at bar is not the same as the statement of the county attorney complained of in the decisions cited by the defendant. In those cases the county attorney made a direct reference to the defendant not having disputed the state's testimony.

In this case the defendant called several witnesses who were in the house the day of the alleged offense, and the record shows they were in the house at the time the prosecuting witness testifies the defendant forcibly attacked and had intercourse with her, and neither of the witnesses called by the defendant deny the fact that the defendant did have forcible intercourse with the prosecuting witness. The argument of the county attorney did not directly or indirectly refer to the defendant having failed to take the witness stand, but was a comment upon the testimony of the witnesses called by the defense, and an argument that, notwithstanding the record shows that some of the witnesses called by the defense were in the house at the time of the alleged rape, neither of them disputes the state's testimony that the defendant committed a forcible act of intercourse with the prosecuting witness, Eddie Lee Parker.

The county attorney was within the facts when he made the statement he did, and is sustained by the following decisions of this court: Murrell v. State, 34 Okla. Cr. 414, 246 Pac. 644; McDaniel v. State, 35 Okla. Cr. 425, 250 Pac. 804.

In Keith v. State, 43 Okla. Cr. 229, 277 Pac. 1037, 1038, this court said:

"It is also contended that the county attorney was guilty of misconduct prejudicial to the rights of the defendant, by making statements by innuendo and otherwise of the failure of the defendant to take the witness stand in his own behalf. With this contention we cannot agree. The only statement made by the county attorney was that the testimony of the state was undisputed. It is not shown by the record that the county attorney made any reference whatever to the failure of the defendant to testify. Where a case is tried and the defendant offers no testimony, the county attorney has the right to comment upon the fact that the evidence of the state is not disputed, and in doing so it cannot be said that he is commenting upon the failure of the defendant to take the witness stand."

The county attorney was within the facts in this case, and his statement cannot be construed as referring directly or indirectly to the fact that the defendant had not taken the witness stand. The county attorney did not commit reversible error in making the statement to the jury complained of by the defendant.

The defendant has argued assignments 3, 4, 5, and 8, together. In presenting this assignment the defendant contends the trial court erred in permitting the state to prove by witnesses certain acts and statements of other parties immediately before and after the alleged act of sexual intercourse committed by the defendant.

The theory upon which the evidence complained of by the defendant was admitted was that other parties entered into a general conspiracy with the defendant to persuade the prosecuting witness to go to the home of the defendant, and there to have sexual intercourse with her, and in presenting its case to the court and jury the state presented it on the theory that a conspiracy had been formed, and that conspiracy was supported by circumstantial evidence. The evidence presented was proper and competent to prove that a crime had been committed as the result of a conspiracy to commit it. A conspiracy may be proved by circumstantial evidence. What are the circumstances? The prosecuting witness was met on the streets of Erick by Walter White, who asked her to go riding; later on other parties who are shown to have been in the house, where the doors were locked, persuaded the prosecuting witness to go with them to the Bonefield Apartment, which was the home of defendant. The defendant was a married man. Wayne Jones, David Epps, the Hill girls, and Pauline Sandlin, and others were there in the house at the time the prosecuting witness arrived, or came shortly thereafter. It is shown that immediately after Albert Yeary arrived at the house he began to try to take liberties with the prosecuting witness; all admit this young girl had been fighting and doing all she could to cause Yeary to leave her alone, and to protect herself from his advances; later on the defendant appears in the room and takes the prosecuting witness away from Yeary, out through the bathroom, where no one but the defendant and prosecuting witness knew what took place.

It is further shown that after the defendant had by force and in a brutal manner cohabited with the prosecuting witness, she was taken upstairs by Walter White on the theory that he would let her out of the house by a

back stairway, but the moment he got her in a room he locked the door and proceeded by force to have intercourse with her; a knock was heard on the door and when the door was opened it was Albert Yeary, who at the point of a knife forced Walter White to leave the room, and Yeary assaulted the prosecuting witness and by force had sexual intercourse with her.

In Brown v. State, 42 Okla. Cr. 11, 273 Pac. 1018, 1019, this court held:

"The least degree of concert of action or collusion makes the act of one conspirator the act of all, and each conspirator is liable for the act of each other conspirator done in pursuance of such conspiracy." Elliott v. State, 45 Okla. Cr. 5, 281 Pac. 305; Sherill et al. v. State, 47 Okla. Cr. 275, 287 Pac. 747.

In Mathews v. State, 19 Okla. Cr. 153, 198 Pac. 112, 113, in the eleventh paragraph of the syllabus, the court said:

"It is immaterial in what order testimony predicated upon a conspiracy is introduced, if the series of facts and circumstances shown in evidence ultimately make a prima facie case of conspiracy. A conspiracy may, and generally must, be proved by a number of independent acts, conditions, and circumstances tending to show an unlawful common purpose of the conspirators."

In Hendrix v. State, 22 Okla. Cr. 230, 210 Pac. 734, this court, in the second paragraph of the syllabus, said:

"A conspiracy ordinarily is established largely by circumstantial evidence of the acts and declarations of the parties, indicative of a common design to do an unlawful act."

In Mathews v. State, supra, it is held:

"It is a general rule that upon the trial of one accused of a crime evidence is admissible to prove a conspiracy to

commit the crime charged, although the conspiracy is not charged in the indictment."

It has been repeatedly held by this court that slight evidence of collusion is all the law requires to admit the acts and declarations of the conspirator in evidence against a coconspirator. Starr v. State, 5 Okla. Cr. 440, 115 Pac. 356; Blanck v. State, 14 Okla. Cr. 339, 169 Pac. 1130.

The court did not err, in admitting over the objection of the defendant, the testimony complained of.

It is further argued by the defendant that the evidence is insufficient to support the judgment. With this contention we cannot agree. The record in this case discloses one of the most diabolical, premeditated, disgraceful and immoral arranged plans to outrage forcibly, and against her will, the prosecuting witness in this case. It seems unreasonable and unbelievable that men who have ever known the word mother or sister could so far degrade themselves as to persuade this young girl to come down to the house and lock the doors and keep her confined for their pleasure, together with a number of other parties The conduct of the defendant sinks below human nature and reaches the low degree of brute.

The jury would have been justified in giving the defendant the maximum punishment. The defendant in this case was fortunate that he got the minimum punishment, under the testimony disclosed by the record. There are no errors in the record. The defendant was accorded a fair trial.

The judgment is affirmed.

CHAPPELL, J., concurs. EDWARDS, P. J., not participating.