## BILL WESTON v. STATE.

No. A-10171.  June 9, 1943.

(138 P. 2d 553.)

52

L. J. Burt and J. F. Greason, both of Sapulpa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Everett S. Collins, Co. Atty., of Sapulpa, for defendant in error.

BAREFOOT, J. Defendant, Bill Weston, was charged in the district court of Creek county with the crime of rape in the first degree, was tried, convicted, and sentenced to serve a term of 15 years in the State Penitentiary, and has appealed.

Before discussing the issues in this case, we desire to quote from the case of Sowers v. Territory, 6 Okla. 436, 50 P. 257, 258. This opinion was rendered in the early Territorial days by Justice Tarsney. It discusses a question that arises in the instant case, a question that does arise in many cases of this character. What Justice Tarsney says is sound law and has been followed from early times to the present in passing upon rape cases that have come before appellate courts for review. It is there said:

"The ordinary rule approved by this court is that where there is any evidence to support the verdict, or where the evidence is conflicting, the appellate court will not examine the record for the purpose of ascertaining or

determining the weight of such evidence, and the verdict approved by the trial judge will be allowed to stand; but cases of the character of the one at bar have always been held an exception to such rule, and even exceptional, in this and other particulars, from the rules of procedure in ordinary criminal cases. Sir Matthew Hale, in 1 Pleas of the Crown (Ed. 1778) p. 363, distinguishes this character of case and the procedure from other criminal cases, and lays down certain rules and admonitory advice that have been approved by the courts of every jurisdiction since that day. He says: 'It is true that rape is a most detestable crime, and therefore severely to be punished, with death; but it must be remembered that it is an accusation easily to be made, and hard to be proved, and harder to be defended by the party accused, though never so innocent.' He then mentions some unfounded malicious prosecutions for rape, among them a case tried before himself, where the prosecutrix swore positively to the commission of the offense, and it turned out upon inspection to have been physically impossible for the accused to have committed the offense. He adds: 'I only mention these instances that we may be more cautious upon trials of offenses of this nature, wherein the court and jury may with so much ease be imposed upon without great care and vigilance, the heinousness of the offense many times transporting the judge and the jury with so much indignation that they are hastily carried to the conviction of the person accused thereof, by the confident testimony sometimes of malicious and false witnesses.' "

This is what we mean when we say that cases of this character should not be decided upon technicalities, based upon a fixed policy that the verdict of the jury is final and absolutely correct on every proposition of fact. The doctrine that one may be convicted on the uncorroborated testimony of the prosecutrix has an exception to the rule that is as well founded as the rule itself, and that is that where her testimony is contradictory, uncertain, improbable or she has been impeached, her testimony should then

be corroborated. And this corroboration should be of such dignity as to give it weight with the jury upon the question that the actual crime has been committed. It should not be such slight circumstances as to leave the court and jury to guess or speculate that the crime has been committed and that the defendant is guilty. Many cases of this nature that come before this court for review are of such character that there cannot but be a doubt as to the guilt of the defendant, and the least action upon the part of the court or the slightest incompetent evidence causes the jury to return a verdict of guilty.

The conviction for first degree rape carries with it a minimum punishment of 15 years in the penitentiary, and a maximum punishment of death or life imprisonment. Certainly there is reason for the rule that has been so long adhered to by this court that close scrutiny will be given to the evidence before a conviction will be permitted to stand.

In the past few years numerous rape cases have been affirmed by this court: Roberts v. State, 31 Okla. Cr. 103, 237 P. 148; Lane v. State, 48 Okla. Cr. 84, 289 P. 357; Lynch v. State, 42 Okla. Cr. 415, 276 P. 501; Fowler v. State, 42 Okla. Cr. 300, 275 P. 655; Malone v. State, 40 Okla. Cr. 102, 267 P. 486; Allen v. State, 35 Okla. Cr. 64, 248 P. 655; Harris v. State, 27 Okla. Cr. 405, 228 P. 525; Varner v. State, 69 Okla. Cr. 294, 102 P. 2d 615. Others have been reversed: Morris v. State, 9 Okla. Cr. 241, 131 P. 731; Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617; Douglas v. State, 19 Okla. Cr. 257, 199 P. 927; Davidson v. State, 57 Okla. Cr. 188, 46 P. 2d 572; Johnson v. State, 52 Okla. Cr. 397, 5 P. 2d 772; Dawes v. State, 34 Okla. Cr. 225, 246 P. 482; Woodruff v. State, 74 Okla. Cr. 289, 125 P.2d 211; Miller v. State, 65 Okla. Cr. 26, 82

P. 2d 317; Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530; Kilpatrick v. State, 75 Okla. Cr. 28, 128 P. 2d 246; Coppage v. State, 76 Okla. Cr. 428, 137 P. 2d 797.

We realize the disadvantage the trial courts are put to in the trial of this class of cases. There is generally strong feeling in the community by reason of the nature of the crime, and often of the person involved. These charges are often the outgrowth of alleged attacks upon children of tender age. The facts are often given wide publicity in the local communities. If a verdict of guilty is rendered by the jury, the only relief that can be given by the trial court is the granting of a new trial at a great expense to the county. In the appellate court we have an opportunity to survey the whole record, after it has been reviewed and briefed by attorneys for both the state and the defendant. It is no pleasant task to reverse a rape case, and it is no pleasant memory to send a man to the penitentiary even for a minimum of 15 years when there is grave doubt of his guilt, and by evidence of one whom the laws require to be corroborated, and the corroboration is not sufficient. But our sworn duty demands that the law be followed, and that justice shall prevail.

The facts as revealed by the record in this case are that defendant, Bill Weston, was charged in Creek county with the crime of statutory rape on Betty Lou Hames, "a female under the age of 14 years, to wit, of the age of 11 years." The date relied upon by the state was on or about March 15, 1939. Both defendant and prosecutrix resided in the city of Sapulpa in the same block, about 150 feet apart. Back of defendant's house 15 or 20 feet was a garage in which he worked as a mechanic, on automobiles. It was a public garage, although only one car could be placed therein at a time. Two large doors opened to the west, and toward defendant's residence.

Prosecutrix testified that she came often to defendant's garage to play, being sent away from home by her mother, and that at various times he had made different articles and given her, and at one time had fixed her skates. The prosecutrix lived with her mother, who was divorced. Her mother died on April 25, 1939, and immediately thereafter her father and his wife, her stepmother, came and took prosecutrix and the other children away. She testified that she had intercourse with the defendant in his garage about the middle of March, 1939, before her mother died. That she had intercourse with him "twenty or thirty times" before that in the garage; and at one time on a creek by the side of the road when he was taking her and her five-year old brother to the country home of her sister, and stopped to get water for his car. She did not know the date of the first act, but that the first time he did anything to her he did it with his finger, and the next day she went back to the garage and he had intercourse with her. Her testimony was that these different acts were every day or so, but that no act was committed after April 25, 1939, the date of her mother's death. With reference to how the acts occurred, she testified:

"Q. And you say you had intercourse with him in March, about the middle of March, 1939? A. Yes, sir. Q. How did he accomplish this act, Betty Lou? A. Well he had me hunker down on him. Q. And which position was he, lying there or standing? A. He was kind of squatting down."

She testified that each act was in the same manner, except the one in the country.

The place where defendant had intercourse with her "twenty or thirty times" was in a public garage where the public came and went at any time. There was no evidence that the doors were closed at any time these acts took place,

and the evidence of every witness was that you could see in this garage from the back steps of defendant's residence, which was only a distance of 15 or 20 feet from the garage. Pictures of the garage are attached to the case-made, and they reveal that when these doors are open you can see the entire inner part of the garage.

Defendant and his wife both testified that she assisted him with his work in the garage, and also did her household duties, but that she was in the garage working at different times every day, and that she at no time saw any of the acts testified to by the prosecutrix. The defendant denied the testimony of the prosecutrix in toto.

According to the evidence of the prosecutrix, she never at any time before the death of her mother told her of the acts of the defendant, nor did she at any time tell anyone until her stepmother claimed that she detected something wrong with her while washing her clothing, and made threats if she did not tell her the truth. It was then for the first time that prosecutrix told of the acts of the defendant. The evidence is uncertain as to when she first told her stepmother, but it certainly was not until in the late summer or early fall of 1939, at least six or eight months after the act charged.

Several witnesses testified to the reputation of the prosecutrix for truth and veracity in the community in which she lived, and that it was bad. This was especially brought out by the witness Ben Rictor, who testified that he kept a store for a number of years in that neighborhood, and that she often came to his store to get articles for the family, and would order things and say they had sent for them, and on investigation he would find that this was not true.

From the above statement of the evidence in this case, on the part of the state, it will be readily observed that it comes clearly within the exception to the rule that one may be convicted upon the uncorroborated testimony of the prosecutrix.

We now come to the consideration of the evidence offered by the state, which it is contended corroborates the testimony of the prosecutrix. It is of the following witnesses: Freddy Hames, seven-year-old brother of the prosecutrix, who was five years of age at the time of the alleged crime; Dr. B. C. Schwab, Dr. J. F. Curry, Leona Hames, and Goldie Bays.

Freddy Hames testified that he was seven years of age at the time of the trial, which was on the 28th day of May, 1941. When asked if he knew what it was to tell the truth:

"A. (No answer.) Q. Do you know what it is to tell a lie? A. (No answer.) Q. What would your mother and father do if you told a lie? A. Whip me."

He testified the defendant took him and the prosecutrix to their sister's home in the country; that they stopped to get some water, and defendant told him to stay in the automobile. That he stayed in the car and listened to the radio, and defendant and Betty Lou went down to get the water and were gone about an hour. He testified that they stayed at his sister's one night and the defendant came and got them and took them home the next day. The prosecutrix testified that they stayed about a week, and that defendant did not come back for them, but that an uncle took them home.

It will be noted that this testimony does not corroborate the prosecutrix as to the time alleged in the information. It at best only presents evidence of an opportunity

at a different time. In the case of Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083, 1092, it is said:

"It may be said in passing that opportunity may be considered as one of the circumstances in a rape case, but it is not corroboration."

Doctor Schwab testified that he had examined the prosecutrix "a year or more ago;" that the purpose of his examination was to determine whether or not she had had intercourse, and from his examination the hymen was ruptured, and "all evidence that she had had intercourse." He was indefinite as to the date he made this examination, but he thought it was in August, 1939. This was about five or six months after the time charged in the information in this case. He could not tell the length of time, but if it had been recent, within a few days, there would have been tissue that would not be healed, but this had been so long off that the hymen was healed. It is very doubtful if this testimony with reference to "all evidence that she had had intercourse" was admissible. Under all the authorities it is impossible to be certain that one has had intercourse simply because of the fact that the hymen has been ruptured and is not present. There are numerous ways for this to be ruined other than by intercourse. This is especially true where the examination is not made until some six or eight months after the time of the alleged intercourse, as in the instant case.

Doctor Curry's evidence was to the same effect. He did not know the exact date of his examination, but he thought it was in the summer of 1939. It was at the same time the examination was made by Doctor Schwab.

Leona Hames was the second wife of the father of prosecutrix. They had married on July 13, 1937. She took the prosecutrix to the offices of Doctor Schwab and

Doctor Curry to have her examined. This was just before school started in 1939. Her testimony was, in part:

"Q. Do you know about when you took her to the doctor's office? A. I don't know just exactly the day, but it was a while before school started. Q. You mean the year 1939? A. Well, no. They come up there in 1939 and she had been there right close to a year when she told me."

Mrs. Bays only testified to the tearing down of a certain building near the premises two and a half or three years prior to the trial, which had no reference to the issues involved.

The defendant, his wife, and several witnesses testified with reference to enmity and ill will existing between the father of prosecutrix and his wife and the defendant, and to specific things that had been done and said by them in reference thereto. It is unnecessary to give details thereof.

Mrs. Trotter, a neighbor, testified to having heard a conversation between the prosecutrix and her stepmother in which prosecutrix told her she did not want to testify against the defendant, and her stepmother told her that she had to. This conversation occurred some time in June, 1939. She testified:

"Q. How did this conversation occur—what brought it up, if you know? A. This is the way I remember: about the time I sat down there, Barbara Jean brought Mrs. Hames' boy to her and she stopped to feed the baby—Betty Lou and Mrs. Hames were washing—and when she stopped to feed the baby, she called Betty Lou. Q. Who called Betty Lou? A. The second Mrs. Hames. She said, 'Come here,' and she says, 'What do you want?' and she says, 'I want you to go over this story again we are going to tell Everett S. Collins (the county attorney),' and that stirred up my curiosity and she says, 'I can't, Leona,' and Leona says, 'You are going to—' Leona used curse

language—and she says, 'You will have to help me.' Mr. Collins: I object to any voluntary statement, outside of the question that was propounded to her. Q. I am asking you to give the conversation between the stepmother and this little girl. Don't put anything else in. A. I wasn't only that she cursed at this time. She says, 'You will have to help me,' and she called her, and Betty Lou says, 'What do you want?' and Leona said, 'Come over,' and she says, 'What is that?' and she says, 'Roller skates,' and she says, 'That is good; that is just what you will tell,' and Betty Lou says, 'Can I go play now?' and they were talking at that time about Mrs. Weston and old Bill Weston, and I surmised— Q. Don't tell that. What else did you hear in that conversation? A. That is all. I went in the house."

She also testified to a conversation she heard between the prosecutrix and her older sister, Barbara Jean:

"A. Barbara Jean said, 'Betty Lou, I wouldn't go down there and tell that story; it will make people feel hard at you,' and she said, 'I don't want to, but Leona is making me.' "

It further appears from the record in this case that after the original information was filed in the district court the county attorney, for some reason which the record does not disclose, dismissed the charge against this defendant, presumably for the reason that he did not have sufficient evidence to convict him. Afterwards there was some trouble in the community where these parties resided, and in which this defendant and probably the father of prosecutrix were involved, but the record does not disclose the nature thereof; and it seems a petition was circulated directed to the county attorney, evidently for the purpose of having him refile the rape charge which had been previously dismissed. This was done, and the new charge started by the filing of an information against

the defendant on February 17, 1941, 23 months after the time charged in the information.

With this record as above stated, what is the duty of this court? We think the correct answer has been given to this question in the case of Sowers v. Territory, heretofore quoted from, and also from the many decisions of this court heretofore cited. We have re-read all of these decisions, and while there is apparent conflict, we have come to the conclusion that those cases which support the doctrine as announced in the Sowers Case are the soundest in reason and should be followed by this court. Those decisions which have not followed the rule as there announced have based their holding upon the doctrine that has been applied to other criminal cases, that where a question of fact is passed upon by a jury, that verdict will not be set aside if there is any evidence to support it. The court in the Sowers Case, after stating the rule, says:

"But cases of the character of the one at bar have always been held an exception to such rule, and even exceptional, in this and other particulars, from the rules of procedure in ordinary criminal cases."

This statement is sound, and is in complete accord with many decisions from this court in cases of this character, which hold that each case finally rests upon the facts of that individual case, after a careful survey by the court of the whole record. This rule is now adhered to by the great weight of authority, and by the best reasoned cases. Our experiences as practitioners for many years and our experience upon the bench and the examination of many cases have led us to come to this conclusion in cases of this character.

Here there is absolutely no corroboration of the prosecutrix as to the act charged in the information. It

clearly occurs that if these acts had occurred "twenty or thirty" times in a public place, where the wife of defendant and her nephew were continually working, that they or some one else would have seen so that they could have corroborated the prosecutrix. They might not have observed one or more occasions, but in the number testified to by the prosecutrix it is inconceivable that some one would not have seen them. The county attorney seemed to have realized this or he would not have dismissed the original information filed against this defendant.

We have carefully read the cases cited in the brief of the Attorney General. They are: Smith v. State, 72 Okla. Cr. 314, 115 P. 2d 925; Thomas v. State, 69 Okla. Cr. 188, 101 P. 2d 283; Bershears v. State, 32 Okla. Cr. 180, 240 P. 326; Ellis v. State, 54 Okla. Cr. 295, 19 P. 2d 972; Gordon v. State, 55 Okla. Cr. 359, 30 P. 2d 934; Garrison v. State, 57 Okla. Cr. 230, 231, 47 P. 2d 224. It is unnecessary to discuss them. The facts of those cases present strong evidence of corroboration of the prosecutrix in each instance, as will be observed by a reading of them.

The case of Self v. State, supra, has many facts which are almost identical with the facts in the instant case. Two doctors who examined the prosecutrix some eight months after the act charged testified that the hymen was absent. In the opinion by Judge Doyle, it is said:

"It is a well-established principle of criminal jurisprudence that incompetent, irrelevant, and immaterial evidence which tends to excite the passions, arouse the prejudices, and awaken the sympathies, or warp or influence the judgment of jurors in any degree, cannot be considered as harmless.

"While a conviction for statutory rape may be had on the uncorroborated testimony of the prosecutrix, this is only warranted when all the other facts and circum-

stances of the offense are corroborative of her testimony and her statements are not inconsistent or contradictory. Without such surrounding facts and circumstances, the bald statement of the prosecutrix against the defendant would be so devoid of testimonial value as to render it unworthy of belief. * * *

"Thus it appears and the record shows, that the testimony of the prosecutrix was obtained through persuasion, fear and duress. It bears those indications which the testimony of children of that age do so frequently bear, of being, to a considerable extent, the thoughts of others— thoughts developed after repeated conversations and much pressure. * * *

"It may be said in passing that opportunity may be considered as one of the circumstances in a rape case, but it is not corroboration. In several cases it has been held that the mere opportunity to commit the crime of rape is not sufficient corroboration of the testimony of the prosecutrix that rape was committed. State v. Brundidge, 204 Iowa 111, 214 N.W. 569; Robbins v. State, 106 Neb. 423, 184 N.W. 53; People v. Brehm, 218 App. Div. 266, 218 N.Y.S. 469, 470; State v. Bowker, 40 Idaho 74, 231 P. 706.

"It is urged on the part of the state that the testimony of the two physicians making the physical examination, to the effect that they did not find any evidence of the hymen, corroborates the testimony of the prosecutrix. * * *

"The rule must be taken as settled in this state that evidence of illicit acts with the defendant prior and subsequent to the date of the charge relied upon by the state for conviction is admissible. * * *

"An exception to the rule exists in some cases, and evidence of improper relations with other men is admitted to rebut the testimony of physicians regarding the absence of the hymen, or to account for a condition of pregnancy. 33 Cyc. 1481. * * *

"In the case of People v. Brehm, supra, the court held that, where a physician had testified that the hymen of prosecutrix had been ruptured, but that he was unable to say when it had been done, it was error to refuse permission to cross-examine prosecutrix as to illicit relations with other men. And held further:

" 'Proof of absence of hymen day after alleged statutory rape and opportunity, together, held not to constitute corroboration of prosecutrix.' * * *

"Aside from the testimony of the prosecutrix, there was no evidence whatever tending to corroborate her testimony as to the several acts, and there was no evidence whatever tending to show the surrounding circumstances or facts of prior and subsequent acts of intercourse between the prosecutrix and the defendant. She stated that the first act and the last act were committed at Tell, Tex. This is the only detail as to time or place of said occurrence. No testimony was given by her as to the particulars and there was no direct evidence showing penetration.

"It also appears that she made no complaint of injury or mistreatment on the part of the defendant until over eight months had elapsed from the date alleged in the information that the act charged occurred.

"The charge of illicit sexual relations is easily made, and often inspired by malice, hidden motives, or revenge, and evidence to establish the same may be easily fabricated and hard to disprove. As has been well stated by an able jurist: There is no class of prosecution attended with so much danger, or which affords so ample an opportunity for the free play of malice and private vengeance. In such cases the accused is almost defenseless.'

"In our opinion no person charged with the crime should be convicted on such improbable, inconsistent, and unreasonable testimony as that given by the prosecutrix in this case.

"Our conclusion is that the evidence was insufficient to justify or sustain the verdict, and that the verdict was

more the result of prejudice than the calm and dispassionate conclusion of the jury upon the facts in evidence.    * * *

"It must not be forgotten that the rules of law in criminal cases are made not only to bring about the punishment of the guilty, but also to protect accused persons upon the presumption that they are innocent of crime until their guilt has been established beyond a reasonable doubt.

"For the reasons stated and because the evidence is entirely insufficient to support the conviction, the judgment of the trial court should be reversed and the defendant discharged.    It is so ordered."

See, also, Miller v. State, 65 Okla. Cr. 26, 82 P. 2d 317.

The defendant in this case made a motion for continuance by reason of the absence of a witness, J. B. Wells, and set up what he would testify if present.    The county attorney, for the purpose of not having a continuance of the case, admitted that the witness, if present, would testify to the facts set up in the affidavit for continuance, but that he would not admit the statements made were true.    With this agreement, the evidence was presented. The witness, according to the affidavit, would have testified that he was in the army at Marchfield, California; that he had recently been inducted and could not get a furlough to return to the state and testify;    that he was a nephew by marriage of the wife of the defendant and lived at the home of defendant and worked in the garage with the defendant during all of the years 1938 and up to April, 1940, and lived in Sapulpa up to about February 15, 1941, when he was inducted in the army.    "That said witness was working with this defendant at all times from early morning to late at night in the garage operated by the defendant in all of March, 1939, and for more than

two years prior thereto;" and that "defendant never had sexual intercourse with the complaining witness in or about said garage where the defendant and witness worked on or about the 15th day of March, 1939, or prior thereto, while said witness worked at said garage; that said garage was a public place and customers were coming and going at all hours of the working day." He would have testified to there being double doors in the garage, twelve feet wide, and that they stood open all day from early morning until late in the evening of each work day; and further as to the close proximity of defendant's house with reference to the location of the garage, and to the fact that defendant's wife was in and out of the garage many times each day in March, 1939, and prior thereto. This evidence was in no way contradicted, nor was this witness impeached. It is hard to observe how a jury could, in view of this testimony, come to a conclusion of the guilt of the defendant. As far as this record is concerned, this testimony was entitled to the same consideration as if the witness was present and testifying in person. It is true that a jury has the right to disregard the testimony of any witness, but certainly under the circumstances surrounding this case there ought to have been some valid reason for the disregarding of the same.

While reviewing the evidence, it cannot but be observed that the evidence of the prosecutrix was not corroborated to that degree which would justify this court in affirming this case. One cannot read this record without coming to the conclusion that this verdict was the result of passion and prejudice. It is not for us to say as to the guilt or innocence of the defendant, only to see that he has a fair and impartial trial, and the evidence is such, under the law, as justifies the taking of his liberty for a period of 15 years.

There is only one matter revealed by this record to which we have not heretofore referred. The defendant offered several witnesses who testified to his good character and reputation. The county attorney on cross-examination did not ask any of them if they had knowledge of defendant having been previously convicted of crime, though he would have had a perfect right to so question them, when defendant put his character in issue, but when defendant took the witness stand he was asked by the county attorney:

"Q. Have you ever been convicted of a felony? A. Yes, sir. Q. When was that? A. I believe the first time I was convicted was in 1924. Q. When was the second time you were convicted? A. I was convicted I believe the second time along about 1936 or 1937."

No other questions were asked in reference to this, and the record does not reveal the nature of the crime of which he was convicted. The answer to these questions of his previous convictions was in all probability the cause of his conviction. This evidence was clearly admissible under the law, and of course was for the consideration of the jury, together with the other evidence in the case, but it only went to his character and credibility as a witness, and not to the corroboration of the prosecutrix. The defendant should not be convicted in this case unless the evidence justified it under the law, even though he had been previously convicted on two different occasions.

For the reasons above stated, the judgment and sentence of the district court of Creek county is reversed and remanded.

JONES, P. J., and DOYLE, J., concur.