Billy Lynn ABLES, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12616.

Criminal Court of Appeals of Oklahoma.

Oct. 29, 1958.

Wayne C. Wheeling, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

PER CURIAM.

The plaintiff in error, Billy Lynn Ables, hereinafter referred to as the defendant, was charged by information in the District Court of Oklahoma County was tried, convicted, and sentenced to serve 45 years in the Oklahoma State Penitentiary at McAlester, Oklahoma.

It is alleged that the defendant, by means of force and threats, did have sexual intercourse, with one Jo Faye Evans, a female over 18 years of age.

The rather voluminous record in this case may be summed up in the presentation of the testimony of three witnesses, the victim, her doctor, and the defendant.

The victim Jo Faye Evans, testified that she was 33 years old, married, and the mother of 4 children. On the 4th day of August, 1957, she was employed as cashier at Louie's 29 Club, selling tickets and had worked there off and on for eleven years. On the night in question, Mrs. Evans started home from her place of employment about 4 a. m. Her testimony reveals the following:

"A. I left the Club about five minutes until four, and I knew that I didn't have enough gas to get home. There is only one station open on MacArthur between the Club and home and I knew I didn't have enough gas to get there, so I went east on 29th Street about four blocks to an all-night filling station and bought gas, and turned directly around and went back down on 29th Street to MacArthur Boulevard, going west on 29th, and when I came to MacArthur there was a car stopped on MacArthur, it was at 29th Street but back off across 29th Street, the car was on the south side, stopped like it had stopped for the stop sign. I stopped and waited for the car to go by. It didn't move, so I made a right turn in front of the car, and as I did the car pulled up behind me and started blinking its light, and right then I knew something was wrong, and I stepped on the gas and speeded up.

"Q. Just a minute, now, go ahead. A. And as I speeded up, the other car speeded up, too. There was no place to pull in, no lights or nothing open, so I was just trying to outrun it. When I came to the River bridge, I was making a little better than eighty miles an hour. The car was staying right behind me. I expected it to pull around and cut in front of me, so I slammed on the brakes and slowed down some, I don't know how much, but the car didn't pull on around; it just came along side of me and stayed there for a minute and then whipped in to me, and I couldn't

see how many was in the car or anything, it was just a car coming at me, I could see the headlights. As it whipped into the side of me it hit just about even with where I was sitting, and I threw my car out of control, around like this; as it went around it turned over so far and I was almost sure it was going to flip, but when I saw the car was going to hit me, I sat down on the horn trying to attract someone's attention. There wasn't any traffic on the road but I thought maybe there might be a house close enough that someone would hear it, and I was so sure that the car was going to flip over I thought it was the only chance I had to attract someone's attention, and no one seemed to hear it, and by the time the car came around and stopped, the side of the car dropped down and skidded sideways off of the pavement, and by the time my car had stopped there was a man standing at the side of it pounding on the glass and he was screaming something, and I couldn't say what, but I heard the glass pop, and I still thought it was a mistake, I thought he had mistaken me for someone else, and thought I would roll the glass down just enough to talk to him and that would be all if he heard my voice and realized I wasn't who he was looking for, that would be all of it, and I rolled the glass down about like that; and as soon as I rolled the glass down he grabbed with both hands on it doing it this way until it shattered the glass, and he reached inside and pulled up the door handle and unlocked the door, and jerked the car door open, and I was still honking the horn. I says, 'Who are you, and what do you want?' He says, 'I am Jerry Elliott but you will never live to tell anyone.' He had me by this shoulder and my leg right here and trying to pull me loose from the wheel and I was holding on to it, and finally he jerked me out; I came out of the car and hit the pavement, he came right down on top of

me; I remember screaming a car would run over me, and when I did he jerked me up and held my head back like this, pushing and shoved me across the road to his car and backed me up against the car with this hand and opened the car door with this one and pushed me back against the car and into the seat, and that's when he started; and then we saw the lights from a car coming from the north and he shoved me over in the seat and crawled in with me. After it was all over with, I told him I was so nasty and he pitched me his handkerchief. I reached for the door handle of the car and he jerked my arm back, and he says, 'I wouldn't try that if I were you,' and he worked and tried to start the car and it wouldn't start, so I asked him if he would light me a cigarette, which he did, and handed it to me, and he seemed calmer then, I mean he would talk to me then. Before this all he would—all he had said, he was gritting his teeth and talking through his teeth, more like a growling or like a wild animal. Then he lit the cigarette and handed it to me, and then he lit himself one, and I says, 'Why don't you let me * * *', I thought that if I could push his car I had a chance to get his tag number and I would also get a chance to get away, but I didn't think I had any chance to get away because he had told me several times I wouldn't have during this time of the attack and pulling my head back like this with my hair and pushing my head back and my chin back. Two cars came by and he says, '* * * if you move or scream I will cut your throat.' I didn't have any reason to doubt him. But all this time my neck was hurting real bad, and after he gave me the cigarette, I asked him to let me push his car to get it started, and he just looked at me and laughed, and then I know that I had to convince him that I wouldn't tell anyone about it, and so I thought if I could make him believe I didn't want my husband to

know about it, that I definitely couldn't tell anyone else, and so I told him that I was married and I didn't want my husband to know what had happened. He said, 'What are you doing out?' and then I told him where I worked and that I was on my way home, and that I lived in Bethany; and I also told him that my Boss lived in Bethany also and that he had stayed to lock up and he would be by just any minute now and he knows my car as well as he knows his own and if he sees my car setting over there he will stop to see what is wrong, and if he does you have had it, and I have, too, because he will tell my husband about it, and the smart thing for you to do is to let me push you and get you started and both of us get out of here just as fast as we can, and so then he grabbed me by the arm and held to my arm until we got over to my car, and he pushed me in and he still had hold of my arm and held to the car door until I pulled around behind him, and as soon as I pulled up behind him the first thing I did was to take the tag number. There was no chance to write it down but I was saying it over and over in my mind, and as I pulled up bumper to bumper with him he commented on the glass in my door being broken. I don't know if he said, 'I broke your glass', or 'Did I break your glass?'. I says, 'You certainly did.' He says, 'I will pay for any damages to your car.' I said, 'Forget it,' to him; I said to myself, 'you will if I live to get away.' Then he said, 'Don't try anything funny,' and he ran back and jumped in his car. When he did I just gave the car a push, just enough to give it a chug, and pulled around him and drove just as fast as I could drive. I ran the stop sign on Reno and at 10th street hoping to attract the attention of a police car. Almost every night there are police cars watching those intersections, but at that night there wasn't, but as I crossed Reno I was watching through the rear view mirror, and when he got his car started good, he turned around and went back south on MacArthur. I kept going north until I got to the filling station at 16th and MacArthur, which was open, and the first one that was open, and I pulled in and ran up to the man at the filling station screaming the number at him, and finally I told him to write it down, which he did, and after he wrote it down I told him that my car had been run off of the road, and that was the tag number, would he please call the police, and he said he would, and he took me over to the desk and put me in the chair, and I put my head down on the desk while he called the police; and after a while, I kept wondering why my husband didn't get there, and then it came to me he hadn't even been called, so I went to the phone and called my husband myself. He got up out of bed and came to me. Then after he got there he called the police back again and told them what had happened; and then two policemen came out, and they talked to me a little in there and went out and looked at my car. My husband took me on to the hospital and left my car there."

The record reflects that Mrs. Evans was first seen by the doctor on duty who administered a hypo. Dr. Leon Gilbert was called at approximately 5:00 and arrived at the hospital in a few minutes and examined Mrs. Evans about 5:30, approximately one hour after the alleged rape.

The doctor testified as follows:

"Q. (Mr. Berry) Doctor, when you got there had she already been administered some sedative? A. She had been given 3 cc of sparein.

"Q. Now, in what physical condition did you find Mrs. Evans when you arrived at the hospital? A. She was very emotionally upset. I would call it a state of emotional shock.

"Mr. Wheeling: To which we object as an utter conclusion of the witness.

"The Court: This witness is an expert medical witness. I think he ought to state what he saw and then what he found from any examination.

"Q. (Mr. Berry) Doctor, you made an examination there after you found her and rendered her some treatment. Describe what you found as a result of your examination and if you administered any further treatment to her what you did? A. The patient was admitted to the hospital. She was given a further injection of sedative. Upon examination I found a blue spot, a bruise which was about two inches long and an inch or so wide on her right shoulder, in approximately this area here (indicating). This was a dark blue common bruise.

"Q. Did you administer any further sedative to her? A. Sedatives were administered twice; once before I arrived and once just after we admitted her to the hospital or once just as soon as she was admitted.

"Q. After you saw her? A. Yes, sir.

"Q. Was it your opinion after you saw her as a doctor that she needed additional sedatives? A. Yes, sir.

"Mr. Wheeling: I object to that question as calling for a conclusion.

"The Court: Overruled.

"Q. (Mr. Berry) Other than the bruise on the right shoulder which you testified to, did you find any other bruises on Mrs. Evans? A. Yes, sir; there was—not necessarily a bruise but a contusion or a red area on the left hip. This was approximately in this location. This was—oh, just milky red, and was an area of three or four inches across.

"Mr. Berry: That is all.

Cross Examination

"By Mr. Wheeling:

"Q. What time of day did you make this examination? A. The ex-amination was made at about 5:30 Sunday morning.

"Q. And you found a bruise on the right shoulder? Is that right? A. That is correct.

"Q. Was it on the arm or on the shoulder? A. It was on the arm about one or two inches below the top of the shoulder; right in this area right here. (indicating.)

"Q. Was it a black and blue mark or a—A. It was bluish in color; dark.

"Q. You couldn't tell from the examination how long that bruise had been there? A. No, sir.

"Q. Then on the right hip you found another bruise? A. Not really a bruise, sir, but a red area.

"Q. A red area? A. Yes, sir.

"Q. Was it bleeding? A. No, sir.

"Q. The skin had not been broken? A. No, sir.

"Q. Just a red area? A. Yes, sir.

"Q. And you, of course, didn't know how long that had been there? A. I judged that it had not been there long for it was not a serious bruise and it would not have stayed long.

"Q. It wasn't even a black and blue mark? A. No, sir. This was what I would call a contusion.

"Q. Now, did you find any evidence that on any part of her body that would indicate a blow having been struck or the patient having been beaten? A. I found no marks on the body other than the two we just discussed.

"Q. Other than the two you mentioned? A. Yes.

"Q. Was she undressed when you made this examination? A. Yes, sir; she had on a hospital gown.

"Q. And all of her garments other than that had been removed? A. That's correct.

"Q. Doctor, did you make any examination of the anatomy of her private parts or sexual parts? A. Yes,

sir; I did a pelvic examination, which was an examination of the vagina.

"Q. Did you find anything wrong? A. I found no bruises or contusions."

The defendant, Billy Lynn Ables, was 25 years of age, lived with his mother and was employed by an asphalt contractor and worked part time at the 2432 Club, a tavern. He had previously served a term in prison for larceny in the state of New Mexico, also admitted having received a sentence of 2½ years for burglary in Oklahoma. The record reflects that the defendant had numerous misdemeanor convictions, including vagrancy, no driver's license, drunk driving, receiving stolen property, improper display of auto tag, and assault and battery. The defendant did not deny having intercourse with the prosecuting witness, but did deny the act was consummated by force or threats. He testified as follows:

"A. Well, early in the evening at the 2432 Club, I had met Tommy Littleton, a friend of mine, and his wife, and a guy by the name of Raymond, and his wife, and that they had invited me out to Snug Harbor earlier in the evening; and I told them that I had to work until late, approximately two o'clock, and they said they would be out there all night and they invited me out, and I told them if I seen fit to go out there I would be out there later in the evening, and they said, 'well, come on out.'

"Q. Where were you along about three or four o'clock in the morning? A. I left, after we had finished the coffee, and I decided to journey out to Snug Harbor. I went out, and it was approximately, oh, I imagine around 3:30 or a quarter to four at that time, and I went out and got in my car, and went west on Southwest 29th Street, directly out to MacArthur Boulevard and there it began to storm and raining exceptionally hard. We pulled up to the stop—I pulled up—a car pulled up to the stop sign, I pulled up behind it, and there was a car across the street with lights on the east side of the street and the lights shining toward us. This car in front of me made a right hand turn on MacArthur, and I pulled up to my place at the stop sign, and waited approximately five seconds for this other car that had the right of way to go or make some kind of indication which way he was turning, and he made no indication whatsoever, so I made a right turn; I made a right turn, and I did not pay no attention whatsoever to that car behind, with the lights on; I made a right turn and drove down north on MacArthur, and this car that was in front of me, I pulled up behind it, and at this point we was almost to the bridge, I believe the North Canadian or the South Canadian bridge, and I blinked by lights twice to show I was going to pass, and I started to pull around and seen that there was a bridge there, so I pulled behind again and we journeyed on across the bridge, and I again blinked my lights to pass just as we got off the bridge, and I attempted to pass. Well, this car either was going to make a lefthand turn or it swerved one, and it connected with my right front. I immediately applied my brakes, and this car made a 180 degree turn and swung around and went off on the righthand side of the road and I got out and walked across to the other car.

"Q. Wait a minute. I will ask you if at any time prior to making contact with that car, if you were traveling at a speed of approximately—

"Mr. Berry: If the Court please, I am going to object to this as leading and suggestive.

"The Court: I believe it is leading, Mr. Wheeling.

"Q. (Mr. Wheeling) All right. I will ask you how fast you were going? A. Approximately 35 to 40 miles an hour. My car—the speedometer does not work on it, and I was—but I was not traveling more than 35 or 40 miles an hour.

"Q. Okey. A. I walked to—as I stopped on the righthand shoulder of the road, I got out of my car and went over to this other car and inquired—there was a woman sitting in the front seat, and I inquired whether she was hurt or not, and she replied 'no'; and as I was walking across the road she rolled down the window and I inquired, and she says, 'no'; and I looked at the car and I said 'there aren't too much damage done,' and she got out of the car and looked and she agreed that there wasn't too much damage done, and at the time she almost fell twice, and I am not so positive but I believe she was drinking but I couldn't state positively and she was overly—I don't know how to put it—she was exceptionally friendly at this point, and I just took it for granted, you know, that she was out and drinking in a party, and I invited her to go on a party, and she says 'no', she had to get home to her husband. I kept talking to her, and finally she was between a half way yes and no answer, and finally, in the meantime, she had got back in—

"Mr. Berry: Your honor, I object to this line of testimony, this halfway yes and halfway no, I mean that he should testify to the conversation and nothing else.

"The Court: All right, just tell what happened and what she said.

"A. She got back in her car, and sat down in the meantime in her car and behind the driver's seat and I was leaning up against the window, or the door, and the window was rolled down, talking to her, and finally, I says, I asked her if she was going to party, and she replied—I don't know how to put that, whether yes or no, between a half yes answer is all I can say. I opened the car door, took her by the left arm, and she slid out of the car, and we walked over to my car, she leaned up against my car door, she had one arm around me at the waist and I had both of my hands on her waist and we was talking and she turned her head up toward me and I kissed her, and at that time she made a circular motion with the lower part of her body up against me, and I then opened my car door, she got in my car and I got in, and she slid over to the right hand side of the seat and I got in, and we commenced talking; and she says at that point, she says, 'we can't do anything here,' she suggested going someplace else. I attempted to start my car and it would not start. She then—we was talking and she says, I believe, 'light me a cigarette,' and I lit a cigarette,' and we continued talking, and I asked her if I could have intercourse with her there, and she says she had to get home, and I kept on talking to her, and finally she says, 'well, all right' the exact words she said. She reached down and pulled her dress up and in the meantime I unzipped my pants. I was sitting under the steering wheel, and she pulled her dress up and undid something, and I did not know what, she slid down in the seat, and she did not have no pants on, she slid down in that seat and I proceeded to have intercourse with her. At that point I asked her to raise her right leg so I could get the rest of it in, which she either put her foot on my dashboard or on the steering wheel, and we consummated intercourse, and had intercourse there completely. I got up and she got straightened up in the seat and put her dress down right about here, and asked if I had a handkerchief and I replied 'yes,' and I reached in my pocket and give her my handkerchief and she cleaned herself up and handed the handkerchief to me, which I put back in my pocket, and she asked me then to light her another cigarette which I did and lit myself one, and she was sitting next to the righthand side of the car door. I then suggested to her giving me a push, which she agreed to. She got out on the righthand side of the car and walked around my car

and across the street and got in her car, and I got out on the lefthand side of my car and walked to the back of my car. She pulled up in the road a little ways and made a turn half way between the road; she backed up and then pulled in behind me and I stood behind my car because it is an old car and stands high off the ground, and I didn't want her bumper to go under my car. I got back in my car, and she pushed me approximately 50 or 100 feet, and then my car started, she pulled out around me and drove off, and that was the last I seen or heard until Tuesday at midnight when they arrested me."

Mrs. Evans was recalled and testified that at the time of defendant reaching his climax she jerked away from him and the discharge was all over her legs and slip.

Dr. Gilbert was recalled and testified that a miscroscopic examination of the moisture content of the vagina showed no male sperm. This was contrary to defendant's testimony that he completed the climax within the complaining witness. There were other witnesses with reference to details but in the opinion of your writer the pertinent facts are enhanced in the testimony of the witnesses which is in substance related herein.

The defendant in his brief asserts 3 assignments of error upon which he relies for reversal or modification:

1. That the verdict was not sustained by sufficient evidence was contrary to and in disregard of the court's instruction.

2. The punishment assessed was excessive.

3. Error of the court in refusing defendant a new trial.

Defendant's appeal is based primarily upon the insufficiency of the state's evidence to sustain the conviction for first degree rape, and to warrant the punishment fixed at 45 years.

The argument made in defendant's brief to support his contentions is confined to two propositions: That the testimony of the prosecutrix clearly showed that she did not comply with the law as to resisting the defendant in his efforts to have sexual intercourse with her, and that the defendant was convicted upon the uncorroborated testimony of the prosecutrix.

Before delving into the discussion of these issues, it is well to state that this court has long recognized that rape cases have a unique character above and beyond that of any other type cases. Some of the established rules ordinarily applied to the criminal cases are considered nonapplicable to the rape case and exceptions made. Ordinarily, this court is not to judge the weight of the evidence and we proclaim it to be the exclusive right of the jury, and where there is any competent evidence to support the verdict of the jury, or where the evidence is conflicting, the court will not examine the record for the purpose of ascertaining or determining the weight of such evidence and the verdict approved by the trial judge will be permitted to stand. But, on cases of this character, an exception to the general rule is recognized, and that exception is that in rape cases the appellate court will make a careful examination of the whole record to the end that it may justify the sentence imposed. See Maxwell v. State, 78 Okl.Cr. 328, 148 P.2d 214. This court has, in a long line of cases, adopted the rule that one may be convicted upon the uncorroborated testimony of the prosecutrix. However, this court said in the Maxwell case, supra, 78 Okl.Cr. at pages 334, 335, 148 P.2d at page 217:

"But we have limited this rule with an exception which is as well established as the rule itself. It is that the testimony of the prosecutrix in a rape case must be clear and convincing, and where it bears upon its face inherent evidence of improbability, is contradictory, inconsistent or unreasonable, it will be held as insufficient, and under these circumstances must be corroborated to the extent of making it sufficient."

These exceptions to the general rule are beyond doubt the result of the reasoning laid down by Sir Matthew Hale in 1 Pleas of the Crown (Ed. 1778 P. 363) when he said:

"It is true that rape is a most detestable crime, and therefore severly to be punished, with death; but it must be remembered that it is an accusation easily to. be made, and hard to be proved and harder to be defended by the party accused, though ever so innocent."

■ The late Judge Barefoot of this Court in the case of Weston v. State, 77 Okl.Cr. 51, 138 P.2d 553, 555, said:

"We realize the disadvantages the trial courts are put to in the trial of this class of cases. There is generally strong feeling in the community by reason of the nature of the crime, and often of the persons involved. These charges are often the outgrowth of alleged attacks upon children of tender age. The facts are often given wide publicity in the local communities. If a verdict of guilty is rendered by the jury, the only relief that can be given by the trial court is the granting of a new trial at great expense to the county. In the appellate court we have an opportunity to survey the whole record, after it has been renewed and briefed by attorneys for both State and the defendant. It is no pleasant task to reverse a rape case, and it is no pleasant memory to send a man to the penitentiary even for a minimum of fifteen years when there is grave doubt of his guilt, and by evidence of one whom the laws require to be corroborated, and the corroboration is not sufficient. But our sworn duty demands that the law be followed, and that justice shall prevail."

Judge Barefoot further says:

"The conviction for first degree rape carries with it a minimum punishment of fifteen years in the penitentiary, and a maximum punishment of death or life imprisonment. Certainly there is reason for the rule that has been so long adhered to by this Court that close scrutiny will be given to the evidence before a conviction will be permitted to stand." ·

These utterances are not cited because they have particular bearing upon the case at bar, but to indicate the cautious approach we are compelled to make in the consideration of a rape case. The record in the instant case has been carefully reviewed. The evidence on the part of the state is sufficient to support a conviction for rape as the jury so. found and likewise the evidence on the part of the defendant would have entitled him to an acquittal if believed.

The testimony of the prosecutrix is in no way contradicted except by the defendant. The defendant's testimony was uncontradicted with one exception, except by the prosecutrix. That contradiction related to testimony of the defendant that he reached sexual climax and discharged in prosecutrix, which she denied and her testimony was substantiated by no sperm being found in her vagina by the examining physician. We can agree with defense counsel that there was little, if any, corroboration of prosecutrix' testimony. However, under the decisions of this court, a conviction may be sustained without corroboration under certain instances. This court has repeatedly held that where the evidence of the prosecutrix is not inherently improbable ·or contradictory, it is not essential to a conviction that there be corroboration. See Varner v. State, 69 Okl. Cr. 294, 102 P.2d 615; Lane v. State, 48 Okl.Cr. 84, 298 P. 357.

■ Though several things surrounding the incident are difficult to understand, and are somewhat bewildering, we are unable to conclude that the testimony of the prosecutrix was contradictory, inconsistent, unreasonable or improbable. She told a reasonable and probable story in a clear and convincing manner and was subjected to rigid cross examination, without being

shaken in the material parts of her testimony. The fact that defendant's story was likewise reasonable, probable, and consistent would not preclude the jury from weighing the evidence and returning the verdict in favor of the state and against the defendant. Under the evidence of the prosecuting witness the defendant was guilty of rape by force and his punishment could have been assessed under the law at death or not less than 15 years in the penitentiary. Under defendant's testimony he was not guilty. If no force was used and the prosecutrix had voluntarily submitted to the act of intercourse as contended by the defendant, he was not guilty of rape in any degree.

█ The jury was the final arbitrator of his fate. They had the best opportunity to judge the truthfulness of the witnesses, they saw and heard the witnesses, observed their demeanor upon the stand. This court has only the record to go by and is hesitant to substitute its opinion as far as guilt or innocence is concerned.

█ The defendant further claims that the testimony of the prosecutrix did not show that she resisted to the extent of her ability. We agree that it is doubtful if the testimony as to resistance would have been sufficient under the early decisions of this court which required "resistance to the uttermost." That is, there must be the utmost force and utmost resistance. However, the rule as to resistance has been considerably modified since the "utmost" rule was adopted by the territorial courts. This court, speaking through Judge Doyle in the case of Bulls v. State, 33 Okl.Cr. 64, 241 P. 605, 606, said:

"The old rule of 'resistance to the uttermost' is obsolete, and is repudiated by the more modern authorities, the law does not require that the women shall do more than her age, strength, the surrounding facts, and all attending circumstances make it reasonable for her to do in order to manifest her opposition."

In Snider v. State, 40 Okl.Cr. 214, 267 P. 687, the court said:

"In this state to constitute rape by force it is not essential that resistance be to the utmost, but need be only such as to make nonconsent and actual resistance reasonably manifest."

Also see Sherrill v. State, 47 Okl.Cr. 275, 287 P. 747. These rules are in harmony with the more modern decision, 52 C.J. 1019, which says:

"The female need not resist as long as either strength endures or consciousness continues. Rather the resistance must be proportioned to the outrage; and the amount of resistance required necessary depends on the circumstances, such as the relative strength of the parties, the age and condition of the female, the uselessness of resistance, and the degree of force manifested. * * *"

"The female need resist only until physical penetration occurs, when the crime is complete, and her failure to resist after that is immaterial and she need resist only until resistance becomes useless as to warrant its cessation. Further, the resistance must be in good faith and not mere pretense or as stated otherwise, it must be real or genuine and active, and not feigned or passive or perfunctory." See also 75 C.J.S. Rape § 12.

█ The instructions as to this phase of the case have been examined and considered favorable to the defendant. Evidently the jury was satisfied with the resistance exercised by the prosecutrix and by their verdict so held. Where the evidence is conflicting and apparently irreconcilable, a question of fact is created, which is within the exclusive province of the jury, to determine whom of the witnesses to believe and whom to disbelieve, or whose testimony to disregard, and it was a question for the jury and not for this court to say whether the testimony of the prosecutrix was worthy of belief.

See Sherrill v. State, supra; also, Loudermilk v. State, 33 Okl.Cr. 146, 242 P. 1060. They no doubt took into consideration the bewildering elements as to why the prosecutrix did not put her car in gear and hurry from the scene as defendant first showed indication of violence by beating on her car window. It is admitted that the motor was running and apparently the opportunity to leave was available. They had before them the evidence that she asked defendant for a cigarette to smoke and a handkerchief with which to clean herself after the act was committed. That she voluntarily pushed defendant's car to get it started after the alleged offense. That she failed to report at the first opportunity that she had been raped but stopped at the service station, asked the attendant to write down the tag number of defendant's car and asked attendant to call the sheriff, that she had been 'run off the road.' They no doubt considered the fact that she was examined by a doctor within an hour after the alleged crime, and no testimony revealed as to torn clothing, blood, lacerations, or violence except a small blue spot on her arm and a slightly red spot on her hip. That the examination by the physician revealed no male sperm in her vagina. That her testimony revealed the act took place in defendant's car, yet her panties were found on the rear seat of her car. All these things were no doubt weighed by the jury along with other facts in the case. They found him guilty, this they had a right to do. The only other proposition presented in this appeal is the contention of the defendant that the punishment imposed by the trial court is excessive. Under the laws of this state, 22 O.S.A. § 1066, the Criminal Court of Appeals is vested with the authority to modify the judgment and sentence of the trial court when such a course would be in the furtherance of justice, and be conducive to the human administration of the law.

Judge Doyle said in Thomas v. State, 69 Okl.Cr. 188, 189, 101 P.2d 283, 284:

"It is both the spirit and intention of our laws that punishment shall be imposed in criminal cases for the protection of society and the reformation of the criminal and punishment should be imposed in keeping with the spirit of the law."

The record reveals that the defendant was 25 years old at the time of the alleged act. While the alleged crime is of a heinous nature, taking into consideration all of the surrounding circumstances, we are of the opinion that the ends of justice will be satisfied by reducing the punishment imposed, and that the judgment should be modified by reducing the sentence of 45 years imprisonment in the state penitentiary to a term of 25 years imprisonment in the state penitentiary.

The judgment of the District Court of Oklahoma County herein is so modified, and the judgment so affirmed.